UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

01 FEB 15 PM12: 57

IN RE:                          )
                                )           N.D. OF ALABAMA
        NABIL AHMED SOLIMAN     )           CV-00-S-2304-M
                                )           ENTERED

MEMORANDUM OPINION                          FEB 15 2001

    This court entered an order on August 18, 2000, authorizing

the Immigration and Naturalization Service ("INS") to force feed,

and to provide nonconsensual medical treatment to, INS detainee

Nabil Soliman.  This court found that Soliman had refused hydration

and nutrition since August 12, 2000, and that continuation of such

actions without medical intervention would likely result in death.

    On December 6, 2000, petitioner Nabil Soliman filed a pro se

"Motion to Contest an Emergency ex parte Order of Authorization to

Force-Feed" (doc. no. 3).  The motion was construed as a motion to

reconsider and vacate this court's order of August 18, 2000.

    Documents   appended   to   Soliman's   motion,   together   with

testimony adduced during a hearing held on December 13, 2000,

brought to this court's attention the circumstances that have led

to   the   petitioner's   prolonged,   and   potentially   indefinite,

detention.  This court, therefore, also construed Soliman's motion

as an inartfully drafted petition for writ of habeas corpus.

## I. FACTS

**A.   Soliman's Egyptian Criminal Background and Association with Terrorists**

Soliman is a 39 year old native and citizen of Egypt.[1]   The United States government believes that he is a member of an Egyptian Islamic extremist group known as the "al-Jihad."[2]   The Islamic Jihad was responsible for the assassination of former Egyptian President Anwar Al-Sadat.   Soliman is wanted by the Egyptian government.   He was convicted *in absentia* during 1982 of various crimes relating to the assassination by the Egyptian State Security Emergency Court.[3]   Soliman has admitted ties to well-known terrorists, but he disputes the extent of his association.

---

[1] Soliman was born in Egypt on April 1, 1961.

[2] The State Department describes the al-Jihad and its activities as follows:

An Egyptian Islamic extremist group active since the late 1970s; appears to be divided into at least two separate factions: remnants of the original Jihad led by Abbud al-Zumar, currently imprisoned in Egypt, and a faction calling itself Vanguards of Conquest (Talaa' al-Fateh or the New Jihad Group).   The Vanguards of Conquest appears to be led by Dr. Ayman al-Zawahiri, who is currently outside Egypt; his specific whereabouts are unknown.   Like al-Gama'at al'Islamiyya, the Jihad factions regard Sheikh Umar Abd-al Rahman as their spiritual leader.   The goal of all Jihad factions is to overthrow the government of President Hosni Mubarak and replace it with an Islamic state.

Government's memorandum (doc. no. 9), Ex. A at 152 (al-Jihad, *available at* http://www.state.gov (Jan. 6, 2001) (printout of information available on the Internet web site of the State Department)).

[3] The alleged crimes include attempting to overthrow the Egyptian government, aiding in the murder of Egyptian government officials and law enforcement officers, and the purchase and possession of illegal firearms and explosives.   *See* Government's memorandum, Ex. A at 8.

For example, Soliman admits knowing Sheikh Umar Abd-al Rahman, an Islamic holy man who has been referred to as "an international symbol of radical Islam."[4]   An INS agent claims that Soliman admitted to sharing an apartment with Mohammad Salameh,[5] who was convicted for his involvement in the World Trade Center bombing.[6] Further, during the period he resided in Jersey City, Soliman attended a mosque at which Sheikh Umar Abd-al Rahman preached, and at which individuals later found to have been involved in the bombing of the World Trade Center worshiped.

Soliman depreciates the import of the foregoing facts by saying that he met Sheikh Umar Abd-al Rahman in Saudi Arabia, where Soliman worked as a taxi driver, and that he transported the Sheikh on one occasion only.   Moreover, Soliman claims that he became acquainted with those terrorists known to have been involved in the bombing of the World Trade Center only because he and they resided in the same neighborhood in Jersey City, an ethnic enclave of Middle Eastern immigrants.   He further contends that he worshiped in the same mosque as those individuals only because it was the

---

[4]See *id.* at 175 (reprint of Carlyle Murphy & Steve Coll, *The Making of an Islamic Symbol; U.S. Spotlight Has Elevated Radical Sheik's Status in Muslim World*, Wash. Post, July 9, 1993 at A1).

[5]*See id.*, Ex. A at 8.

[6]Salameh was found to have participated in the manufacture of the explosives and the acquisition of the Ryder van that was used to transport the bomb to the World Trade Center. *See* United States v. Salameh, 54 F.Supp.2d 236, 246 (S.D. N.Y. 1999).

closest mosque to his apartment.  Soliman also denies that he was involved in the assassination of President Sadat.  He asserts that the Egyptian government has mistaken him for another individual with a name similar to his.[7]

Upon first meeting, Soliman is a compelling witness.  As shall be discussed in the following section, however, an Immigration Court Judge who has had far more contact with him, and, who has heard considerable more evidence than this court, determined Soliman to be "lacking in credibility."

## B.   Soliman's Immigration History

In September or October of 1981, when he was 19 years old, Soliman traveled to Yemen "for trade purposes."[8]  Soon thereafter, on October 6, 1981, Egyptian President Anwar Al-Sadat was assassinated.  Soliman's family later informed him during a telephone conversation that the Egyptian secret police had come to

---

[7]A certificate issued by the Head of the Criminal Affairs Department at the Supreme State Security Prosecution of Egypt verifies that an individual named "Nabil Ahmad Farag **Rizk**," defendant number 142 in the "Jihad Organization Case," was convicted *in absentia* of crimes relating to the assassination of President Sadat.  Government's memorandum, Ex. A at 15.  The document verifies that Rizk was sentenced to five years of hard labor.  *Id.*  A letter from the Consulate General of Egypt to the FBI, which was attached to the aforementioned document, states that "Nabil Ahmad Farag **Soliman**" is wanted by the Egyptian Authorities.  *Id.* at 3.  Another document produced by the Egyptian government includes the heading "Nabil Ahmad Farag Suliman AKA Nabil Farag Rizk."  *Id.* at 5.

[8]Government's Memorandum in Support of Nabil Soliman's Civil Immigration Detention and Force-Feeding Order (doc. no. 9), Ex. B. at 70.

4

their home for the purpose of arresting him.[9]  During the following seven years Soliman resided in various countries of the Middle East.[10]  He spent six months in Iraq after departing Yemen and, at some point, spent an undetermined amount of time in Jordan.[11]  Immediately prior to his arrival in the United States, Soliman lived in Saudi Arabia for approximately four years.[12]

Soliman first entered the United States on December 26, 1988, on a non-immigrant business visa.  When the term of that visa expired on March 20, 1989, Soliman remained in the United States illegally.  In April of 1991, he married Alexandre Martine, a United States citizen with whom he worked at a car service.  The following month, Martine submitted on behalf of her husband a petition to adjust his immigration status[13]:  an effort to allow Soliman to remain legally in this country.

Soliman traveled outside this country on two occasions while

---

[9]*Id.* at 72.

[10]*Id.*, Ex. A at 1.

[11]*Id.*, Ex. B at 123.

[12]*Id.*

[13]Technically, the first step in such a process is the filing of a Form I-130, a "petition for alien relative" — generically referred to as a "visa petition."  The INS then determines whether the marriage is bona fide, and not entered into solely for immigration purposes.  If that petition is approved, then the application to adjust the alien's immigration status is adjudicated by the INS and, if granted, the alien may be granted the status of either "conditional permanent resident" or "lawful permanent resident," depending upon the length of the marriage.  8 U.S.C. § 1186a.

that application was pending.  In January of 1992, he applied for and received permission from the Immigration and Naturalization Service to travel outside the United States.  He returned to New York City in March of that same year, where he was paroled[14] into the United States, pending the outcome of Alexandre Martine's petition to adjust his immigration status.  In August of 1992, Soliman again received permission to travel outside the United States.  He traveled to Morocco, where he remained for 25 days. Soliman said that he traveled to Morocco to visit his children, who were born to his former, Egyptian wife.  He again returned to the United States *via* New York City during September of 1992, and was again paroled into the country.  That was Soliman's last arrival in the United States.

Martine's petition to adjust Soliman's immigration status was denied by the Director of the INS Newark District on May 24, 1994. Soliman and Martine appealed the decision to the Board of Immigration Appeals.

Soliman was arrested in New York City by Federal Protective Service Police on August 21, 1996, for causing a disturbance in an

---

[14]"The term 'parole' is used by both the INS and the courts to 'encompass a variety of situations in which temporary entry or stay in the United States is authorized.'" Jean v. Nelson, 727 F.2d 957, 966 n.8 (11th Cir. 1984) (*en banc*) (quoting 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 2.54 (rev. 1982)), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

INS office.[15]   During the ensuing interview, Soliman revealed information that first linked him with terrorist organizations and activities.   Soliman was then interrogated by a Special Agent of the FBI Joint Terrorism Task Force.

The Board of Immigration Appeals affirmed the District Director's denial of Martine's petition to adjust Soliman's immigration status on May 27, 1997.  One month later, on June 25th, the INS charged Soliman as an arriving alien and revoked his parole.  He subsequently was served with a notice to appear and arrested by INS investigator John Gervino, a member of the FBI Joint Terrorism Task Force.   During interrogation, Soliman mentioned the names of individuals involved in the World Trade Center bombing.

After having been detained for two months, Soliman requested that the INS allow him to depart the United States voluntarily, by withdrawing his application for admission.   The INS initially agreed, but then rescinded its agreement and opposed Soliman's motion to withdraw the application.   A hearing addressing the

---

[15]Soliman testified that he had waited in line at an INS office in New York City for approximately 4 hours.  When he arrived at the window, the official told him that he was in the wrong place, and that he needed to go to a different office on the tenth floor.  When he arrived at the tenth floor office, an official told him to go back downstairs and wait in line.  Soliman apparently tried to cut in line, and was questioned by a guard.  Soliman was taken to another area where he waited for three hours.  A Special Agent of the FBI then interviewed him.  *See* Government's memorandum (doc. no. 9), Ex. B at 87.

motion was held before Immigration Judge Alberto J. Riefkohl in New
York City on August 7, 1997.  During the hearing, Soliman testified
that he was willing to depart the United States voluntarily, and
that he had purchased an airplane ticket to Jordan.   The Judge
denied Soliman's motion to withdraw his application for admission,
finding that his marriage to Martine was a sham — consummated
solely for the purpose of acquiring legal status within the United
States.

On August 15, 1997, Soliman submitted to the Immigration Court
an application for asylum and withholding of removal.   The court
held three hearings addressing Soliman's application during
September and October of 1997.  During a hearing held on October 2,
1997, Soliman testified that he is not the individual who was
convicted *in absentia* by the Egyptian military court, and provided
documentation to support his assertion.[16]   The Immigration Judge,
however, placed scathing assessment of Soliman's credibility into
the record:

> ... Respondent's [Soliman] testimony was plagued with
> fantastic explanations, vagaries, implausible theories
> and evasiveness.  These characteristics, compounded with
> the fact that this court has concluded that the
> respondent had attempted a fraud upon the INS and the BIA
> with regard to his marital relationship, made possible a
> determination that the respondent has not been a credible

---

[16]*See* Government's memorandum (doc. no. 9), Ex. B, 168-246.

> witness and that in fact [he] is intentionally
> withholding information from the court, while at the same
> time, he is begging this court's protection from being
> returned to Egypt.[17]

The Judge further found that Soliman's

> disposition to enter into a sham marriage is an
> indication of his predisposition to twist facts to serve
> his purposes.  The court will be the first to admit that
> if respondent's concern for the truth had made a positive
> impression ... this court may have extended some
> protection in withholding his removal to Egypt.  It is
> precisely the court's assessment of his lacking in
> credibility that forces the court to conclude
> otherwise.[18]

The Immigration Court Judge denied Soliman's application for asylum

and withholding of removal on October 30, 1997, and ordered him

removed from the United States.

Soliman appealed that decision to the Board of Immigration

Appeals in November of 1997.  The Board affirmed the decision of

the Immigration Court denying asylum and withholding of removal on

August 3, 1998, but vacated the designation of Egypt as the country

to which Soliman should be removed, ordering that he be removed

from the United States in accordance with 8 U.S.C. § 1231(b)(1).[19]

---

[17]*See id.*, Ex. A at 70.

[18]*Id.* at 72.

[19]This section provides that aliens arriving in the United States must be removed to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States.  If that country is unwilling to accept the alien, 8 U.S.C. § 1231(b)(1)(c) provides alternative countries to which the alien shall be removed.  In Soliman's case, the last country in which he had boarded an aircraft flying to the United States was Morocco.

Soliman subsequently requested protection under Article 3 of the Convention against Torture and Other Cruel or Degrading Punishment, because he feared that he would be tortured if deported to Egypt. On April 30, 1999, Soliman was notified by the INS that, due to the issuance of new regulations governing the adjudication of claims for protection under the Convention against Torture, he should file a motion to reopen with the Board of Immigration Appeals in order to have his claim considered. He did so on May 18, 1999, and on July 23, 1999, the Board of Immigration Appeals issued an order reopening his case and remanding it to the Immigration Court Judge. Hearings regarding Soliman's eligibility for withholding of removal pursuant to Article 3 of the Convention Against Torture were held in Newark, New Jersey, during September and October of 1999, before Judge Riefkohl: the same judge who had presided over the removal proceedings. Soliman's request for withholding of removal was granted. The court found that: Soliman's identity had not been established conclusively; the Egyptian government tortures and mistreats prisoners; and, Soliman had established that, more likely than not, he would be subjected to torture if returned to Egypt.[20] The government appealed, and the Board of Immigration Appeals

---

[20]Motion to contest an Emergency ex parte order of authorization to force-feed (doc. no. 3), Ex. 4 at 3-5.

vacated the Immigration Judge's order withholding removal. The Board found "there are serious reasons to believe that [Soliman] committed a serious non-political crime in Egypt before he arrived in the United States."[21] Accordingly, the Board found Soliman to be statutorily ineligible for withholding of removal under the Convention against Torture. The Board instead granted Soliman deferral of removal.[22]

During December of 1999, while the foregoing proceedings were ongoing, the INS began inquiring whether other countries would accept Soliman. The INS first contacted Morocco, the most recent country from which he had been paroled into the United States. The Consulate of Morocco, however, notified the INS that it was unwilling to accept Soliman. In November of 2000, the INS contacted several additional countries on Soliman's behalf, including Saudi Arabia, Angola, Afghanistan, Pakistan, Singapore, and Thailand. All refused to accept him.[23]

Soliman has been detained during the entire course of the

---

[21] *Id.,*Ex. 5 at 2 (internal quotations omitted)

[22]The Board's grant of deferral of removal under the Convention against Torture did not affect the Immigration and Naturalization Service's ability to continue to detain Soliman. The regulations at 8 C.F.R. § 208.17(c) provide that "[n]othing in this section shall alter the authority of the Service to detain an alien whose removal has been deferred under this section and who is otherwise subject to detention. In the case of such an alien, decisions about the alien's release shall be made according to part 241 of this chapter."

[23]*See id.,* Ex. A at 125-151.

foregoing immigration proceedings, beginning in 1997.   To this
date, he has been detained in excess of three and a half years.

**C.   Soliman's Hunger Strike**

Following the issuance of a final order of removal, there is
a 90 day window during which the alien may be detained.[24]   This
period may be extended if the alien is inadmissible, has been
convicted of certain criminal offenses, presents a threat to the
community, or is a flight risk.[25]   Soliman contends that none of
these conditions is present, that the 90 day period of detention
ended on August 4, 2000, and that he is now being illegally
detained.   In protest, Soliman began a hunger strike on August 8,
2000,[26] stating:

> I am frustrated for being detained for more than three
> years without a crime.   I prefer to face persecution in
> my own country than in the United States.   I will make my
> hunger strike very serious, stop the liquids, water, and
> medication because I can see the INS's plan to keep me in
> jail indefinitely.   I am facing a gross injustice and
> totally inhumane practices.[[27]]

Soliman was hospitalized on August 11, 2000, after becoming

---

[24]*See* discussion *infra* Part II.B.1.

[25]*See id.*

[26]Soliman had previously engaged in a hunger strike in December of 1999
while he was in custody in Batavia, New York.   Soliman was subsequently
transferred to a facility in South Carolina.   Apparently Soliman ended his first
hunger strike sometime between December of 1999 and August of 2000.   *See*
Government's memorandum, Ex. A at 2.

[27]Motion to Contest an Emergency ex parte Order of Authorization to Force-
feed (doc. no. 3), Ex. 6 (Soliman's declaration of August 4, 2000).

unresponsive to verbal commands.  He received intravenous fluids in the emergency room on August 11, 2000.  Soliman subsequently became responsive and thereafter refused further medical treatment.   On August 18, 2000, the United States government moved this court for an order authorizing medical personnel to provide forced feeding and non-consensual medical treatment.  This court issued such an order on that date.

Soliman was transferred to Columbia, South Carolina, for medical treatment on September 7, 2000.  The United States filed a motion to force-feed him in the United States District Court for South Carolina.  That court refused to issue such an order, finding that it would infringe upon Soliman's First Amendment right to freedom of expression.

Soliman then was transferred back to Etowah County, Alabama, on September 19, 2000.  He alleges that on November 13, 2000, he was again force-fed, with "abusive force."  He alleges that medical personnel initially inserted a large tube into his nose, which did not fit.  The medical personnel then attempted to insert smaller and smaller tubes until Soliman's nose began bleeding internally. The doctor ordered that Soliman be injected with an anesthetic, and a gastric tube inserted through his mouth.  Since then, Soliman has

received an injection of anesthetic and a gastric tube through the mouth every three days.

**II. DISCUSSION**

**A.    Habeas Corpus Jurisdiction**

"Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241.  Even so, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-546, precludes a district court from exercising habeas corpus jurisdiction over petitions challenging immigration removal orders, removal proceedings, or detention pending removal. *Richardson v. Reno*, 180 F.3d 1311, 1314 (11th Cir. 1999).  An alien may challenge such actions by appealing them to the Board of Immigration Appeals.   An alien may then petition a United States Court of Appeals for judicial review of a final removal order.  *Id.*

Despite the foregoing limitations on judicial review, the Eleventh Circuit recently held that the Illegal Immigration Reform and Immigrant Responsibility Act does not prevent a district court from considering the habeas petition of an alien who is subject to prolonged or indefinite detention pursuant to a final order of removal.  *Boz v. United States*, 228 F.3d 1290, 1292 (11th Cir.

2000).  In *Boz*, the Eleventh Circuit found that the petitioner was not challenging the removal order itself, but only the legality of the prolonged, indefinite detention that resulted from the inability of the INS to effect his removal.  In like manner, Soliman is not challenging his removal order, but only the legality of his prolonged, indefinite detention.

**B.   The Legality of Soliman's Detention**

The power to control the admission of aliens is a political function, an inherent attribute of national sovereignty.  *See Jean v. Nelson*, 727 F.2d 957, 964 (11th Cir. 1984) (*en banc*), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).  Congress has plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to the United States.  *Id*. at 965.  Executive officials of the United States government also have authority over immigration affairs, derived from the Executive's plenary authority over foreign relations, and, from the power delegated by Congress by virtue of immigration statutes.  *Id*. at 965-66.  Accordingly, the Supreme Court has upheld sweeping delegations of congressional authority over immigration matters to the Attorney General.  *Id*. (collecting cases).  As a result of the political character of the authority to

control immigration, the judiciary may not substitute its judgment for that of the political branches, and judicial review of immigration decisions is narrow. *Id.* at 967, 975. Even so, courts must insure that legislation by Congress complies with the Constitution of the United States, that actions of the Attorney General comply with the statutes enacted by Congress, and that the actions of low-level immigration officials comply with the policies of their superiors in Washington. *Id.* at 975.

When addressing such issues, federal courts must exercise judicial restraint, and avoid making sweeping constitutional proclamations. *Jean v. Nelson*, 472 U.S. 846, 853, 105 S.Ct. 2992, 2997, 86 L.Ed.2d 664 (1985) ("Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."). This court accordingly will first address whether Soliman is entitled to relief on statutory grounds, or under policies promulgated by the INS.

### 1.   Statutory authority to detain and to parole

Congress provided procedures governing the detention and removal of inadmissible aliens in 8 U.S.C. § 1231. According to that section, the Attorney General must remove an alien who has been ordered removed from the United States within 90 days.

16

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period").

8 U.S.C. § 1231(a)(1)(A). For aliens who are not serving criminal sentences, the "removal period" begins on the later of either the date on which the order of removal becomes administratively final, or the date of the final order of a reviewing court. 8 U.S.C. § 1231(a)(1)(B). Aliens awaiting removal <u>must</u> <u>be</u> <u>detained</u> during the 90-day removal period. 8 U.S.C. § 1231 (a)(2). If the INS is unable to effect the removal of the alien within the 90-day removal period, the alien is to be released subject to INS supervision. 8 U.S.C. § 1231(a)(3). Such supervision includes requiring the alien to periodically appear before an immigration officer for identification, to submit to medical and psychiatric exams, to give other personal information under oath,[28] and to obey reasonable written restrictions on the alien's conduct or activities. 8 U.S.C. § 1231(a)(3)(A)-(D). Under limited circumstances, certain aliens may be detained beyond the removal period. For example, 8 U.S.C. § 1231(a)(6), pertaining to "inadmissible or criminal

---

[28]The alien may be required to "give information under oath about the alien's nationality, circumstances, habits, associations, and activities, and other information the Attorney General considers appropriate." 8 U.S.C. § 1231(a)(3)(C).

aliens," provides:

> An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

8 U.S.C. § 1231(a)(6).   Thus, the Attorney General may detain beyond the 90-day removal period aliens who are inadmissible, aliens who have committed aggravated felonies, aliens who are otherwise dangerous, and aliens who are a flight risk.

The Immigration Judge who presided over Soliman's removal proceedings did not identify the section under which he was to be removed.   However, the government represented at a hearing held before this court on January 31, 2001, that Soliman was ordered removed pursuant to 8 U.S.C. § 1182(7)(A)(i)(I), which reads:

> **(i) In general**
> ...[A]ny immigrant at the time of application for admission—
>
> > **(I)** who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued by the Attorney General under section 1181(a) of this title...

is <u>inadmissible</u>.

8 U.S.C. § 1182(7)(A)(i)(I) (emphasis supplied).[29]   Therefore, Soliman is "[a]n alien ... who is inadmissible under section 1182" of Title 8, United States Code, and the Attorney General possesses the statutory authority under 8 U.S.C. § 1231(a)(6) *supra* to detain him beyond the 90-day removal period.

Aliens, such as Soliman, who are detained beyond the 90-day removal period receive the benefit of INS custody review procedures.  In 1999, Michael A. Pearson, the Executive Associate Commissioner of the Office of Field Operations, issued memoranda detailing temporary custody review procedures to be utilized by district directors of the INS.[30]   These procedures generally are referred to as "Pearson reviews."[31]

The Pearson Memorandum issued on February 3, 1999, required the INS District Director to review, before the expiration of the removal period, the propriety of the detention of any alien being

---

[29]Although Soliman was initially lawfully admitted as a non-immigrant visitor, he overstayed his welcome.  He then became subject to the grounds of inadmissibility of 8 U.S.C. § 1182 when he departed and was paroled into the United States upon his return.  Pursuant to 8 U.S.C. § 1182(d)(5)(A), "parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served, ...his case shall continue to be dealt with in the same manner as that of any other applicant for admission."  Accordingly, upon the revocation of parole, Soliman was treated as an inadmissible alien seeking admission to the United States.

[30]See Government's memorandum (doc. no. 9), Ex. E.

[31]*See* Government's memorandum (doc. no. 9) at 29 n.11.

19

held pursuant to a final order of removal.[32]  At the time of the review, the alien has an opportunity to demonstrate by clear and convincing evidence that he is not a threat to the community and is likely to comply with the removal order.[33]  If the alien satisfies this burden, the alien may be paroled pursuant to 8 U.S.C. § 1182(d)(5)(A), which provides, in relevant part:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States....

Such parole has been characterized as "an act of legislative grace," and does not affect an alien's immigration status. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956 (1953).  The Pearson Memorandum lists several factors to be considered by the INS District Director when making parole determinations, including:   (1) the nature and seriousness of the alien's criminal convictions; (2) other criminal history; (3) sentences imposed and time actually served; (4) history of failures to appear for court; (5) probation history; (6) disciplinary problems while incarcerated; (7) evidence of rehabilitative effort or recidivism; (8) equities in the United

---

[32]Government's memorandum (doc. no. 9), Ex. E at 1.
[33]*Id.*

States; and (9) prior immigration violations and history.[34]  If the detention is continued, the District Director must review the alien's status every six months to determine whether circumstances have changed.[35]  The memorandum stresses that the District Director should continue to make every effort to effect the alien's removal during and subsequent to the removal period.[36]

An additional "Pearson Memorandum" was issued on August 6, 1999, amending the previous document.  It provided that, following the removal period, the District Director shall conduct a second review either nine months from the date of the final order of removal, or six months after the last review, whichever is longer.[37]  Aliens detained beyond the removal period must be notified in writing at least 30 days prior to the second review.   The Memorandum mandated that the second review include an interview with the detained alien.[38]  It provided that the alien must be allowed to submit information, and to have a representative present.[39]  The written notification of the District Director's decision to continue detention must clearly delineate the factors

---

[34]*Id.* at 3.

[35]*Id.* at 2.

[36]*Id.*

[37]*Id.* at 3.

[38]*Id.*

[39]*Id.*

presented by the alien in support of his release, and the reasons for the adverse decision.[40]  The District Director's decision would be preliminary, however, subject to final review by INS Headquarters.[41]  Thereafter, the alien would receive a custody review every six months.[42]

Still later, the INS promulgated a new rule, effective December 21, 2000, delineating permanent review procedures for detained aliens who had been ordered removed.  The permanent procedures include a preliminary records review, the opportunity for a panel interview and recommendation, and a final decision by the Headquarters Post-Order Detention Unit.[43]  The reviews will now be conducted on at least an annual, rather than a semi-annual, basis.[44]

The procedures for evaluating Soliman's custody status thus have changed at least three times since he was first detained in 1997.

The record submitted by the government is sparse with regard to Soliman's custody reviews.  The record does include, however,

---

[40]*Id.*

[41]*Id.*

[42]*Id.*

[43]See Detention of Aliens Ordered Removed, 65 Fed. Reg. 80,281, 80,282 (Dec. 21, 2000) (to be codified at 8 C.F.R. pts. 212, 236, 241).

[44]*Id.* at 80,289.

the decision of the District Director to continue detention following the first file review.  That decision, dated September 18, 2000, states the basis for the District Director's determination:

> You are not being released because:
>
> Your release would endanger the community and you would not likely appear for future proceedings in your case.
>
> You are wanted in Egypt for various security-related crimes, including participation in the assassination of former president Anwar Al-Sadat.  Given the penalties you face in Egypt, it is highly unlikely that you would voluntarily surrender for removal.[45]

The decision letter also states that Soliman will be entitled to another review of his custody status within six months of the date of the decision.  Because that decision was issued prior to December 21, 2000, the effective date of the new rules, Soliman had an opportunity to appeal the September decision to the Board of Immigration Appeals.  The record does not reveal whether he did so. In any event, it cannot be said at this point that the former Attorney General abused her discretion when determining that Soliman is dangerous and a flight risk.  Soliman has admitted to associating with dangerous terrorists and extremists; he has been convicted in Egypt of various crimes,[46] albeit in absentia; he is

---

[45]Government's memorandum (doc. no. 9), Ex. A at 116.

[46]See supra note 3.

wanted by the Egyptian government for questioning concerning a crime, the gravity of which cannot be overstated; and, he attempted to achieve the status of a lawful permanent resident by fraud. Therefore, this court finds the detention of Soliman, at this point in time, is reasonable.

### 2. The Constitutionality of Soliman's detention

Courts have long recognized the legitimacy of the Attorney General's authority to detain aliens.[47] Aliens are detained during removal proceedings to ensure their compliance with, and participation in, the proceedings.[48] They also are detained subsequent to the entry of a final order of removal to facilitate the removal process.[49] Finally, dangerous aliens are detained to protect citizens of the United States.[50]

The Eleventh Circuit has held that "excludable aliens," sometimes referred to as either "unadmitted aliens" or (most recently) "inadmissible aliens"[51] — *that is, aliens like Soliman*

---

[47]*See, e.g., Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 630-31, 97 L.Ed. 956.

[48]*See* Daniel R. Dinger, *When We Cannot Deport, Is It Fair to Detain?: An Analysis of the Rights of Deportable Aliens under 8 U.S.C. § 1231(a)(6) and the 1999 INS Interim Procedures Governing Detention*, 00 B.Y.U L. Rev. 1551 (2000).

[49]*Id.*

[50]*Id.*

[51]Before Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, and on the date when Soliman last arrived in the United States (September of 1992), there was a distinction between "excludable aliens" and "deportable aliens". *See* Ngo v. Immigration and Naturalization Service, 192 F.3d 390, 394-95 (3d Cir. 1999). *Excludable aliens* were those who

*who have not been "admitted" to the United States, but who instead have only been permitted to stay in this country temporarily, pending a decision on admissibility* — possess no constitutional right to parole, even if the denial of parole raises the prospect of indefinite detention. *See Adras v. Nelson*, 917 F.2d 1552, 1556 (11th Cir. 1990) ("It has been firmly established in this circuit that the obverse of this grant of authority to the Attorney General to parole an excludable alien is the power to deny such parole"); *Fernandez-Roque v. Smith*, 734 F.2d 576, 580-81 (11th Cir. 1984) ("[P]arole is part of the admissions process. As such, its denial or revocation does not rise to the level of a constitutional infringement."); *Jean*, 727 F.2d at 969 ("Since an alien's legal

---

were ineligible for admission to the United States, and *deportable aliens* were those who were residing in the United States, even if their presence was illegal, and there were separate proceedings for their exclusion or deportation. *See id.*; *see also* Jean v. Nelson, 727 F.2d 957, 961 n.1 (11th Cir. 1984) (*en banc*) ("[A]liens who have reached our border but have not formally been admitted to the United States are described as 'excludable' or 'unadmitted' aliens."), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

The Illegal Immigration Reform and Immigrant Responsibility Act eliminated the distinction between exclusion and deportation proceedings, and proceedings for the removal of all aliens are now termed "removal" proceedings. *See* 8 U.S.C. § 1229. Case law distinguishes excludable aliens (now referred to as "inadmissible aliens") from deportable aliens, holding that aliens who have effected an entry, even if they are illegally present, are entitled to at least limited constitutional due process rights, while those seeking admission have only those rights conferred by Congress. *See Jean*, 727 F.2d at 967-68. This distinction is known as the "entry doctrine."

Under the "entry doctrine," applicant aliens were considered detained at the border, regardless of whether they were paroled into the United States while their application was pending. *See id.* at 968, 969 (an alien who is permitted to enter the United States pursuant to parole pending a decision on admissibility "'is treated as if stopped at the border.'")(quoting *Mezei*, 345 U.S. at 215, 73 S.Ct. at 631).

25

status is not altered by detention or parole under the entry doctrine fiction, it seems clear that plaintiffs here can claim no greater rights or privileges under our laws than any other group of aliens who have been stopped at the border."); *id.* at 975 ("[W]e conclude that we must resist the temptation to tamper with the authority of the Executive by ruling that excludable aliens have constitutional rights in this area, even with regard to their applications for parole.").

Furthermore, in a controversial and widely criticized decision (that, nevertheless, has not been altered during the intervening 47 years), the Supreme Court held that an alien who is not a lawful permanent resident of the United States may be confined indefinitely without a hearing. *Mezei*, 345 U.S. at 214, 73 S.Ct. at 630.[52]

Even so, excludable aliens have some limited rights. For example, in *Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987), the Fifth Circuit held that excludable aliens in federal custody have the right to be "free from gross physical abuse." *Id.* at 1374; *see also Adras*, 917 F.2d at 1559 (citing *Lynch*, *supra*).

---

[52]*See, e.g., Jean*, 727 F.2d at 971 n.17 (quoting 2 K. Davis, Administrative Law Treatise § 11:5 (2d ed. 1979)): "The holding that a human being may be incarcerated for life without opportunity to be heard on charges he denies is widely considered to be one of the most shocking decisions the Court has ever rendered."

However, this court need not address the constitutionality of indefinite detention in the context of the present action. First, the review procedures promulgated by the INS ensure that Soliman will receive procedural due process. Indeed, those procedures "are due process of law":

> While resident aliens, regardless of their legal status are therefore entitled to at least limited due process rights, aliens "who have never been naturalized, nor acquired any domicile of residence within the United States, nor even been admitted into the country pursuant to law" stand in a very different posture: "As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law."

*Jean*, 727 F.2d at 968 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660, 12 S.Ct. 336, 339, 35 L.Ed. 1146 (1892)) (emphasis supplied). Soliman's removal period expired on August 4, 2000. In accordance with the most recent INS procedures, Soliman should receive a review of his detention within either six months following the expiration of the removal period, or nine months following entry of the final administrative order of removal. At such time, Soliman will be interviewed and will be afforded the opportunity to submit evidence supporting his contentions. Soliman will be able to have an unfavorable determination reviewed by the Headquarters Post-Order Detention Unit. If he remains in custody

thereafter, Soliman's detention will be reviewed annually.

Moreover, Soliman's detention does not implicate substantive due process.  Given the aforementioned procedures, it is unlikely that Soliman's detention will be arbitrary or indefinite.  Although the Attorney General has the power to detain all inadmissible aliens, the new review procedures ensure that only those aliens who are determined to be dangerous or a flight risk are to be detained. At present, Soliman is being detained because the Attorney General reasonably concluded that he is a flight risk and may present a danger to the community.  This court likewise is not inclined to release into the community a potentially dangerous alien who is inadmissible to the United States, at least not on the basis of this record.  Because Soliman's case is due to be reviewed in the near future, any inquiry into whether the indefinite detention of an inadmissible alien would violate substantive due process would be premature.[53]

---

[53]As discussed *supra* note 29, this case presents the unusual scenario where Soliman has been, at different times throughout his stay in the United States, a deportable resident alien (by virtue of his admission as a non-immigrant visitor and violation of that status by remaining longer than permitted) and an inadmissible alien (by virtue of his two departures from the United States and parole upon his return).  As he is currently treated as an inadmissible alien under the law, he is entitled only to those rights provided by Congress.  Even assuming *arguendo* that Soliman were entitled to the additional constitutional protections provided by the Fifth Amendment, because of his previous illegal residence, Soliman's continued detention is not excessive when balanced against the government's present interest in protecting the community from an alien it has determined to be dangerous and in enforcing the order removing Soliman from the country.  *See* United States v. Salerno, 481 U.S. 739, 750, 107 S.Ct. 2095,

C.   **The Constitutionality of Force-Feeding INS Detainees**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct 2254, 2259, 96 L.Ed.2d 64 (1987). Finding that the difficulties of prison administration warrant special consideration, the Supreme Court articulated a standard of review for prisoners' constitutional claims "that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85, 107 S.Ct. at 2259 (alteration in original) (quoting *Procunier v. Martinez*, 416 U.S. 396, 406, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974)). In *Turner*, a group of prisoners brought a class action lawsuit challenging a regulation restricting their correspondence, and a regulation restricting their ability to marry. The *Turner* Court held that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

---

2103, 95 L.Ed.2d 697 (1987) (an individual's strong liberty interest "may, in circumstances where the government's interest is sufficiently weighty, be subordinated"). In this case, although Soliman asserts a mistake of identity, the government maintains that he has been convicted *in absentia* in Egypt for his participation in the assassination of President Anwar al-Sadat. Further, Soliman has links to convicted terrorists and the Egyptian al-Jihad, a State Department designated foreign terrorist organization. *See* Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,112 (Oct. 8, 1999). As such, the government's interest is sufficiently weighty to justify the subordination of any Fifth Amendment liberty interest Soliman, an alien subject to an order of removal, may possess.

related to legitimate penological interests." *Id.* at 89, 107 S.Ct

at 2261.  The Court found that the prohibition on correspondence

did not unconstitutionally abridge the First Amendment rights of

prison inmates, reasoning:

> The prohibition on correspondence is reasonably related
> to valid corrections goals.  The rule is content neutral,
> it logically advances the goals of institutional security
> and safety identified by Missouri prison officials, and
> it is not an exaggerated response to those objectives.

*Id.* at 93, 107 S.Ct. 2264.  On the other hand, the court found the

marriage restriction "constitutionally infirm," because it was

overbroad   and   not   reasonably   related   to   the   articulated

rehabilitation goal.  *Id.* at 99, 107 S.Ct. at 2267.  Thus, under

*Turner*, prisoners do possess limited constitutional rights.

### 1.   First Amendment

In *Hakim v. Hicks*, 223 F.3d 1244 (11th Cir. 2000), the

Eleventh Circuit applied the *Turner* standard to a prisoner's claim

that his First Amendment right to free exercise of religion was

violated when the Florida Department of Corrections refused to

recognize his Muslim identity.  The court reiterated the standard

and its underlying rationale.

> Unlike the strict standards of scrutiny applicable to the
> constitutional rights of persons in a free society, the
> Supreme Court has adopted a deferential standard for
> determining whether a prison regulation violates an

30

inmate's constitutional rights.  A prison regulation,
even though it infringes the inmate's constitutional
rights, is an actionable constitutional violation only if
the regulation is unreasonable.  This court has described
the standard as follows:

> The *Turner* Court identified several factors
> that serve to channel the reasonableness
> inquiry: (1) whether there is a "valid,
> rational connection" between the regulation
> and a legitimate governmental interest put
> forward to justify it; (2) whether there are
> alternative means of exercising the asserted
> constitutional right that remain open to the
> inmates; (3) whether and the extent to which
> accommodation of the asserted right will have
> an impact on prison staff, inmates, and the
> allocation of prison resources generally; and
> (4) whether the regulation represents an
> "exaggerated response" to prison concerns.

*Id*. at 1247-48 (quoting *Pope v. Hightower*, 101 F.3d 1382, 1384

(11th Cir. 1984)) (footnote and citations omitted).

More to the point of this case, the Fifth Circuit has provided

a pithy statement of a hunger-striking prisoner's First Amendment

Rights.

> First, it is clearly established that, under some
> circumstances, prisoners have a First Amendment right to
> communicate with the press.  Likewise, a hunger strike
> may be protected by the First Amendment if it was
> intended to convey a particularized message.  However, so
> long as reasonable and effective means of communication
> remain open and no discrimination in terms of content is
> involved, prison officials are accorded latitude in
> fashioning restrictions on time, place and manner of
> communications.  Such restrictions must be reasonably
> related to a legitimate penological interest.

*Stefanoff v. Hays County, Texas*, 154 F.3d 523, 527 (5th Cir. 1998) (citations omitted).

To determine whether speech restrictions in a penal detention facility are reasonable, this court must apply the test articulated by the Supreme Court in *Turner* and elucidated by the Eleventh Circuit in *Hakim.*

The government has cited three interests in force-feeding Soliman:  concerns for the maintenance of security and orderly institutional operations within the facility in which he is detained; concerns for preservation of his life;[54] and, concerns over the administrative costs and burden precipitated by Soliman's hunger strikes.  After analyzing these interests in light of the four factors set out above, this court finds the practice of force-feeding Soliman is reasonable, and does not offend the First Amendment.

First, there must be a valid, rational connection between the challenged practice and the governmental interests put forward to justify it.  Here, there is such a connection between force-feeding Soliman and the government's interest in the  preservation of life.

---

[54]The government maintains that foreign relations with Egypt will be damaged if Soliman is allowed to die, because the Egyptian government will be denied the opportunity to address the charges asserted against him.  That may be true, but this court prefers to instead couch the inquiry in terms of a concern for all human life.

The only way for the government to preserve the life of a hunger striking detainee is to force-feed that person.   Likewise, the court finds a rational connection between force-feeding hunger strikers and the government's interest in orderly operations of the detention facility.   The government has asserted that, if Soliman is allowed to die, other inmates will infer that the government is indifferent to their well-being, and that such a result would likely incite disorderly conduct.[55]

Second, the court must determine whether alternative means of exercising First Amendment rights to free expression remain open to Soliman.   The court finds that he has alternative means of protesting his detention.  Soliman has been allowed to correspond with the outside world.  He has been allowed to make telephone calls.  He has even been in contact with the media.  Clearly, numerous, less disruptive avenues of expression are open to Soliman.

Third, the court must examine the extent to which accommodation of Soliman's First Amendment right to engage in a hunger strike to protest prison practices will have an impact on prison staff, inmates, and the allocation of prison resources.

---

[55]*See* Emergency ex parte motion for order of authorization (doc. no. 1) at 9.

This is tantamount to examining the administrative burden Soliman will cause if he is allowed to continue refusing nourishment. The government has demonstrated that Soliman already has become an onerous administrative burden.[56]

Finally, the court must determine whether force-feeding Soliman represents an "exaggerated response" to penal concerns. The practice does not appear to be an exaggerated response, because it is the only way to sustain the life of a hunger striking prisoner. The method employed may be determinative, however. One commentator has noted that there are three methods of force-feeding: 1) nasogastric tube feeding, accomplished by inserting a tube down the nose through the esophagus and into the stomach; 2) intravenous feeding, accomplished by inserting a catheter into a major blood vessel leading to the heart; and 3) gastronomy, direct surgical access to the stomach. Steven C. Bennett, *The Privacy and Procedural Due Process Rights of Hunger Striking Prisoners*, 58 N.Y.U. L. Rev. 1157, 1174 (1983) (hereinafter "Bennett"). Thus far, the government has force-fed Soliman by injecting him with anesthetic and inserting a nasogastric tube. This is the preferred method for force-feeding, and does not represent an exaggerated response to his hunger strike. *Id.* Soliman claims that officials

---

[56]*See* Government's memorandum (doc. no. 9) at 50.

threatened on November 13, 2000, to perform gastronomic surgery to insert a permanent tube into his stomach.   Gastronomy is an extremely invasive procedure, and is an exaggerated response to a hunger strike.  This court accordingly finds that force-feeding is a reasonable response, but only so long as the government continues to perform nasogastric tube or intravenous feeding.

In accordance with the standards and findings articulated above, this court finds that the government's limitations on Soliman's First Amendment rights are reasonable.

### 2.   Right to Privacy

The Supreme Court has recognized that individuals possess a constitutional right to privacy.  Unfortunately, the precise source of the right is difficult to ascertain.   The Supreme Court has generally couched the right in terms of substantive due process, guaranteed by the Fourteenth Amendment.   *See Washington v. Glucksberg,* 521 U.S. 702, 719, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997); *Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990).

> Although the United States Constitution does not specifically mention a right to privacy, the Supreme Court has recently recognized it as an independent constitutional right.  The Court has grounded the right on at least three sources: common law rights, emanations from specific constitutional provisions, and the general

> requirements of "liberty" underlying the Constitution.
> In these various contexts, "privacy" implicates several
> different interests — including those of bodily
> integrity, control of personal information, and sanctity
> of the home — all of which are unified by a common
> principle of personal autonomy.

Bennett, 58 N.Y.U. L. Rev. at 1165 (footnotes omitted).  In one

case, the Supreme Court defined the right to privacy as stemming

from the "penumbras" and "emanations" of the Bill of Rights.  *See*

*Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14

L.Ed.2d 510 (1965).

In *Cruzan* the Supreme Court assumed, for the purposes of that

case, that the United States Constitution would grant a competent

person a constitutionally protected right to refuse lifesaving

medical treatment (*e.g.*, hydration and nutrition).  *Cruzan*, 497

U.S. at 279, 110 S.Ct. at 2852.  The Court had occasion to

explicate its holding in *Cruzan* seven years later, in the case of

*Washington v. Glucksberg*:

> We began with the observation that "[a]t common law, even
> the touching of one person by another without consent and
> without legal justification was a battery."  We then
> discussed the related rule that "informed consent is
> generally required for medical treatment."  After
> reviewing a long line of relevant state cases, we
> concluded that "the common-law doctrine of informed
> consent is viewed as generally encompassing the right of
> a competent individual to refuse medical treatment."
> Next, we reviewed our own cases on the subject, and
> stated that "[t]he principle that a <u>competent</u> person has

36

> a constitutionally protected liberty interest in refusing
> unwanted medical treatment may be inferred from our prior
> decisions." ... We concluded that, notwithstanding this
> right, the Constitution permitted Missouri to require
> clear and convincing evidence of an <u>incompetent</u> patient's
> wishes concerning the withdrawal of life-sustaining
> treatment.

*Glucksberg*, 521 U.S. at 724, 117 S.Ct. at 2270 (emphasis supplied).

The *Glucksberg* Court then distinguished the right to refuse

unwanted, life-sustaining medical treatment from the right to

commit suicide.

> The right assumed in *Cruzan*, however, was not simply
> deduced from abstract concepts of personal autonomy.
> Given the common-law rule that forced medication was a
> battery, and the long legal tradition protecting the
> decision to refuse unwanted medical treatment, our
> assumption was entirely consistent with this Nation's
> history and constitutional traditions.  The decision to
> commit suicide with the assistance of another may be just
> as personal and profound as the decision to refuse
> unwanted medical treatment, but it has never enjoyed
> similar legal protection.

*Id.* at 725, 117 S.Ct. at 2270.  The *Glucksburg* Court also analyzed

its substantive due process jurisprudence, as discussed in *Planned*

*Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112

S.Ct. 2791, 120 L.Ed.2d 674 (1992).

> In reaching [its] conclusion, the [*Casey*] opinion
> discussed in some detail this Court's substantive-due-
> process tradition of interpreting the Due Process Clause
> to protect certain fundamental rights and "personal
> decisions      relating      to      marriage,      procreation,
> contraception, family relationships, child rearing, and

education," and noted that many of those rights and liberties "involv[e] the most intimate and personal choices a person may make in a lifetime."

*Glucksburg*, 521 U.S. at 726, 117 S.Ct. at 2270.  The *Glucksburg* Court concluded:

> The history of the law's treatment of assisted suicide in this country has been and continues to be one of the rejection of nearly all efforts to permit it.  That being the case, our decisions lead us to conclude that the asserted "right" to assistance in committing suicide is not a fundamental liberty interest protected by the Due Process Clause.

*Id.* at 728, 117 S.Ct. 2271.

Federal Courts generally have approved of force-feeding hunger striking inmates, regardless of whether the person was a convicted prisoner, a pre-trial detainee, or a person held pursuant to a civil contempt order.  For example, in *In re: Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170 (2d Cir. 1998), the Second Circuit upheld a district court's order to force-feed a civil contemnor who had engaged in a hunger strike for political and religious reasons.  The court found:

> Although Doe, as a civil contemnor, has been convicted of no crime, the institution where he is housed is still responsible for his care while incarcerated.  Other compelling governmental interests, such as the preservation of life, prevention of suicide, and enforcement of prison security, order, and discipline, outweigh the constitutional rights asserted by Doe in the circumstances of this case.

*Id.* at 172.   In a previous case, a district court in the Second
Circuit upheld the force-feeding of an inmate.   *In re Sanchez*, 577
F. Supp. 7 (S.D. N.Y. 1983).   There, a civil contemnor engaged in
a hunger strike to protest his continued imprisonment and that of
other civil contemnors.   The court first noted that force-feeding
an   individual   "under   any   circumstances   ...   raises   serious
constitutional questions regarding an individual's right to control
his own body and the validity of a hunger strike as an exercise of
first amendment rights and as an expression of views."   *Id.* at 8.
Nevertheless, the court issued an order to force-feed the inmate,
finding Sanchez's motive for engaging in the strike was to "bring
maximum pressure to bear upon the Judge who will ultimately rule
upon his motion to vacate the contempt order."   *Id.*   The court
found that his purpose was not to exercise First Amendment rights,
but to manipulate the system.

    The   Eighth   Circuit   also   has   condoned   force-feedings.    In
*Martinez v. Turner*, 977 F.2d 421 (8th Cir. 1992), a pre-trial
detainee confined at the United States Medical Center for Federal
Prisoners alleged that officials violated his due process rights
when they ordered that he be force-fed after the seventh day of his
hunger   strike.    The   Eighth   Circuit   summarily   dismissed   his

argument, finding:

> Martinez's claim that he was force-fed also fails to
> state a constitutional claim.  The mere allegation of
> forced-feeding does not describe a constitutional
> violation.  Bureau of Prison regulations authorize
> medical officers to force-feed an inmate if they
> determine that the inmate's life or permanent health is
> in danger.  Attachments to Martinez's pleadings reveal
> that USMCFP medical officers determined that forced-
> feeding was necessary to his health. ...

*Id.* at 423.  In an earlier case, *Garza v. Carlson*, 877 F.2d 14 (8th

Cir. 1989), a prisoner in a maximum security facility asserted the

right to die as a result of a religious fast.  Medical officials

merely threatened to force-feed the prisoner, and to take samples

of urine and blood.  The court found:

> As the District Court noted, federal prison regulations
> provide treatment for "hunger strikers," but do not
> address those who are fasting for religious purposes.
> Garza did not state how labeling him as a hunger striker
> harmed him.  Nor did Garza contend he was force-fed at
> [the United States Medical Center for Federal Prisoners].
> In any event, preservation of prisoners' health is
> certainly a legitimate objective, and prison officials
> may take reasonable steps to accomplish this goal.
> Garza's rights under the Constitution were not violated
> by the threat of receiving involuntary nourishment. ...

*Id.* at 17.

State courts also have upheld the right to force-feed hunger-

striking prisoners.  For example, in *White v. Narick*, 292 S.E.2d 54

(W.Va. 1982), a convicted murderer serving a life sentence in a

state penal institution began a hunger strike to protest the
conditions at the prison. The Supreme Court of West Virginia
recognized that the federal constitution has been interpreted to
secure the right to privacy over one's body, and that competent
patients have been allowed to refuse medical treatment. *Id*. at 58.
The court held, nevertheless, that:

> West Virginia's interest in preserving life is superior
> to White's personal privacy (severely modified by his
> incarceration) and freedom of expression right. Our
> research indicates that although only one appellate court
> has dealt with death resulting from hunger strikes, they
> are common in prisons throughout the country. Their main
> aim is to gain attention from prison officials and
> occasionally from the public, to manipulate the system.
> We cannot condemn fasting — Ghandi taught us about its
> force — as a way to secure change. But prison officials
> must do their best to preserve White's Life.

*Id*. (emphasis supplied).

In *Von Holden v. Chapman*, 450 N.Y.S.2d 623 (N.Y. App. Div.
1982), a convicted murderer engaged in a hunger strike, with the
intention of committing suicide, for the stated reason of drawing
attention to the starving children in the world. Chapman contended
that he had a constitutional right to privacy as articulated in
*Griswold v. Connecticut*. The New York appellate court disagreed,
saying:

> Even overlooking the fact that Chapman's status as a
> prisoner severely delimits his constitutional privileges,

41

> it is self-evident that the right to privacy does not
> include the right to commit suicide. ... To characterize
> a person's self-destructive acts as entitled to that
> constitutional protection would be ludicrous.

*Id.* at 68.  The court went on to note that several state statutes

authorizing the state and private individuals to interfere with

suicide attempts foreclose such a conclusion.  *Id.*  The court found

that the right of an adult to refuse extraordinary medical

treatment is "clearly distinguishable" from the right to commit

suicide, finding that even though "a competent adult must be

allowed to refuse extraordinary medical treatment which would

prolong his life," the State retains a "legitimate interest in

protecting the lives of its citizens."  *Id.* at 69-70.  The court

noted that, regardless of a patient's right to self-determination,

that patient may be required to submit to unwanted medical

treatment if the patient is a danger to the community, or that

patient may be required to forgo wanted medical treatment that

would be inherently hazardous to the patient's life.  *Id.* at 70.

Finally, the court found that "[e]ven superficial comparison of the

right to decline medical treatment with the right to take one's

life illustrates their essential dissimilarity...."  *Id.*

In *Cruzan* and *Glucksberg*, the Supreme Court came close to

recognizing a liberty interest in self-determination as implicit in

42

the doctrine of informed consent.  However, the Court engaged in a balancing test in *Cruzan* without specifying whether it was employing a rational basis test or the compelling interest standard.

In the present action, this court must balance the government's interests against Soliman's interests.  Here, the government has asserted its interest in maintaining order and safety, its interest in avoiding litigation, and its interest in preserving life.

Before balancing the interests, however, it is necessary to determine which standard of review applies: compelling interest, rational basis, or some other standard.   If Soliman has a fundamental right to privacy, the compelling interest standard applies.  If he does not, the deferential rational basis standard applies.

Whether the compelling interest standard applies depends upon whether the right is "fundamental," or "implicit in the concept of ordered liberty." *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147 (1973). Although the Supreme Court has severely limited its enumeration of rights considered "fundamental" for the purposes of substantive due process, the

43

fundamental rights it has recognized generally involve self-determination over one's body.   For example, those enumerated rights include the right to procreate or not to procreate, and the right not to be sterilized.  *See Roe,* 410 U.S. at 113, 93 S.Ct. at 705 (right of woman to terminate pregnancy before viability of foetus); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510(1965) (right of married persons to use contraceptives); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed 1655 (1942) (right of criminal not to be sterilized).   Each of these "fundamental rights" involves bodily integrity.

The government contends that the compelling interest standard should not apply, because detained aliens and prisoners do not have the same rights as free citizens of the United States.   For example, in *White v. Napoleon,* 897 F.2d 103 (3d Cir. 1990), the Third Circuit held that prisoners have a substantive due process right to be free from bodily intrusion, but prison officials could compel a prisoner to accept treatment when such officials deem it necessary to carry out valid medical or penological objectives.

For purposes of this opinion, this court will assume, without deciding, that excludable aliens possess a right to be free from bodily intrusion coextensive with that of convicts and detainees

44

who are United States citizens.

Soliman testified that he does not desire to die.[57]   Thus, he does not assert the right to commit suicide while detained in INS custody.   Instead, he asserts the right to be free from grossly intrusive medical treatment.

In response, the government has expressed reasonable, specific reasons for asking this court to order force-feeding.  For example, the government contends that the Chief of Corrections for Soliman's detention facility overheard that other INS detainees plan to engage in a mass hunger strike if Soliman wins his case.[58] The United States also points out that Soliman has been an onerous administrative burden.  Since his hunger strike began, Soliman has been moved to three states, at least three hospitals, and numerous detention centers in an effort to preserve his life.[59]  Moreover, the record reveals that Soliman himself expects the INS to continue to make efforts to preserve his life, even if this court refuses to authorize his force-feeding.[60]

This court accordingly finds that the interests asserted by the government are legitimate penological objectives, that the

---

[57]*See* Transcript of hearing on December 13, 2000 (doc. no. 6), at 30.

[58]*Id.*

[59]*Id.* at 51.

[60]*See* Transcript of hearing of December 13, 2000 (doc. no. 6) at 54.

force-feeding of Soliman is warranted, and that Soliman's motion to reconsider and vacate this court's prior order is due to be denied.

### III. CONCLUSION

The Attorney General has the statutory authority to detain Soliman as an inadmissible alien, as a danger to the community, and as a flight risk.  Thus far, INS officials have complied with the Attorney General's policies regarding custody review.  The recent promulgation by the INS of exhaustive review policies ends any past practice of arbitrarily or indefinitely detaining excludable aliens.  Such aliens may only be detained beyond the removal period when they are determined to be dangerous or a flight risk.  Soliman has been determined to be both.  Moreover, because the government has conclusively demonstrated that force-feeding furthers legitimate penological objectives, the government may force-feed Soliman despite any First or Fifth Amendment rights he may possess, but only so long as nasogastric tube or intravenous feeding procedures are employed.  For these reasons, Soliman's motion to reconsider and vacate this court's prior order, also considered as a petition for writ of habeas corpus, is due to be denied.  An appropriate order will be entered contemporaneously herewith.

DONE this the *15th* day of February, 2001.

_____
United States District Judge

47